UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| DAVID MICHAEL SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 3-11-286 |
| | § | |
| THE COLLEGE OF THE | § | |
| MAINLAND, *et al*, | § | |
| | § | |
| Defendants. | § | |

## **MEMORANDUM AND ORDER**

On June 17, 2010, Plaintiff David Michael Smith, a long-time professor of government at Defendant The College of the Mainland, spoke up during a special meeting of the College's Board of Trustees at which public comment was prohibited. A few days later, the College formally reprimanded Smith for violating his duty under the Faculty Code of Professional Ethics to treat all persons with respect, dignity, and justice. Smith filed suit alleging that the College and its then President David Elam violated his First Amendment rights by retaliating against him for the remarks he made at the board meeting. For the reasons discussed below, the Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

1

I.   **BACKGROUND**

This suit arises out of a vigorous dispute over whether the College would continue to deduct union dues from faculty members' paychecks. The underlying facts are largely undisputed. The College of the Mainland is a two-year community college in Texas City, Texas. Smith is a longtime professor of government at the College; according to him, he has taught there for thirteen years and is the president of its faculty union, COM-Unity. At all times relevant to this suit, Defendant Michael Elam was president of the College.[1]

According to Smith, the College had had a policy of deducting union dues from faculty members' paychecks for nearly 30 years. However, in April 2010, Elam ended the dues deduction policy. This decision generated controversy in the College community. A number of concerned parties, including Smith, wrote critical letters published in the *Galveston Daily News*. *See* Docket Entry Nos. 32-10, 32-11 at 3–4. Additionally, one of the College's trustees, Mr. Criss, requested that the Board hold a vote on reversing Elam's action. In response to Criss's request, the Board scheduled a discussion session—a format that allows discussion between Board members on the record but disallows public comment—for a meeting to be

---

[1] Elam, however, is no longer employed by the College, and Smith has abandoned all claims against him. Summary judgment will therefore be granted in Elam's favor.

held on June 17, 2010. The meeting was held on campus in the "administration boardroom." Docket Entry No. 27-1 Ex. A-1.

In relevant part, the meeting began with a report by one of the College's business office employees on the costs of the dues deduction policy. *See* Docket Entry No. 37 at 1:15–8:40. After the report concluded, Criss asked the employee some pointed questions about the figures presented in the report. *See id.* at 8:40–13:55. In response, Elam spoke up to defend the College's move away from deductions toward direct deposits. *See id.* at 13:55–14:58. Criss then questioned whether union members were being treated less favorably than employees using deductions for other purposes. *See id.* at 14:58–15:06. Elam disagreed with the assertion and stated that he had met with the union and that "we ended up with the discussion that we could work towards trying to figure out a way to do direct deposit for them." *Id.* at 15:10–15:22.

As soon as Elam had finished speaking, Criss expressed surprise, and Smith interjected to state "[n]o, no sir, we did not agree to that at all." *Id.* at 15:22–15:30. There was then some crosstalk, the Board chair rapped her gavel for order, and Elam responded to Smith, "Wait a minute, wait a minute, now don't lie, don't lie, don't lie, because that was the last thing we talked about, we mentioned it, and I can even, I can go back and look at the

minutes, we can find out the people who, who raised the issue as I was leaving about direct deposits, so, so don't, you know, don't go there." *Id.* at 15:28–15:53. Smith immediately retorted, "Yeah, don't go there, you're not telling the truth, there were 30 people there and they heard you." *Id.* at 15:53–15:57. Criss then chided Smith and indicated he was out of order by stating "[c]ome on, David." *Id.* at 15:57–15:59. There was then a several-second pause, after which Criss quipped "[w]here did David go," an apparent inside joke that was greeted with raucous laughter by the entire Board. *Id.* at 16:00–16:20. As the laughter ended, one of the trustees, apparently addressing Smith, jokingly stated that "you might want to grab a seat, man, and pull it up to the table." *Id.* at 16:21–16:25. Elam, returning to serious conversation, then attempted to ask Smith whether direct deposit for union dues would be acceptable, but Criss called a point of order, sustained by the Board chair, reminding Elam that he was not to address guests like Smith. *Id.* at 16:23–16:58. The conversation then moved on; Smith did not make any other statements.[2]

Though Smith's involvement in the exchange lasted only a minute, it had far-reaching consequences. On June 23, 2010, Elam complained to Smith's immediate supervisor, Pam Millsap, at that time the Chair of the

---

[2] Ultimately, the Board reversed Elam's decision and reinstated the dues deduction policy in a subsequent meeting held on June 28, 2010.

4

College's Department of Social & Behavioral Sciences, that Smith's actions had been "disruptive, inappropriate, unprofessional, insubordinate, and a violation of the Faculty Code of Professional Ethics." Docket Entry No. 27-1 Ex. C ¶ 3. Together, Elam and Millsap interviewed a witness who had attended the June 17 meeting. They then met with Smith, who conceded that he had spoken out of order but denied that he had been disruptive, unprofessional, or that he had violated his ethical duties.

Elam and Millsap then formally reprimanded Smith by issuing him a "Formal Conduct Correction Plan" that placed Smith on "Level 1 Discipline." *Id.* ¶ 5; Docket Entry No. 32-4. The reprimand stated that, at the June 17 meeting, Smith "repeatedly engaged in loud and unprofessional outbursts"; "shouted that the President of the College had made an untrue statement"; "interrupted the President and bellowed 'that's not true!'"; that his "eruptions were during the Board's discussion"; that he "repeatedly interrupted the dialogue between Trustees and the President"; was "admonished, at least twice . . . to curtail [his] behavior, comments, and outburst"; and that he had "dismissed their directive [to remain silent] and continued." Docket Entry No. 32-4.

Following this recitation of alleged facts, the reprimand stated that Smith's "outburst during the Board meeting violates the Faculty Code of

5

Professional Ethics as outlined under DH(Exhibit E) Employee Standards of Conduct.  Further, [Smith's] behavior is intolerable, inappropriate and a complete disruption of the College process; [sic] bordering on insubordination."[3]  Docket Entry No. 32-4.  The reprimand ordered Smith to "[i]mmediately cease and desist all such disruptive, inappropriate, unprofessional and insubordinate behavior.  Any further violations will be cause for immediate disciplinary action, up to and including termination."  *Id.*

On July 8, 2010, Smith filed an official grievance against Elam in an attempt to have the reprimand overturned and expunged from his record.  In it, Smith argued that the reprimand misrepresented his behavior at the meeting and that the charges Elam had made against him were mere personal attacks and not a suitable basis for disciplinary action.  Docket Entry No. 27 Ex. B-2 at 4.  Elam rejected the grievance in October 2010 and affirmed his earlier decision to reprimand Smith.  Smith appealed that decision to the Board of Trustees.  Although the Board never resolved the appeal, Millsap eventually took Smith off of Level 1 Discipline in January 2011, supposedly for obeying the reprimand's order to refrain from any

---

[3] The applicable section of the faculty ethics code states that "[t]he professional educator shall treat all persons with respect, dignity, and justice."  Docket Entry No. 27-1 Ex. B-1, at 3 ¶ 1; *see* Docket Entry No. 32-3 at Interrogatory No. 6.

6

further disruptive behavior. Docket Entry Nos. 27 Ex. C, at ¶ 6; 27 Ex. C-2. Nonetheless, the reprimand remained on Smith's record and Millsap referred to it as a justification for giving Smith negative marks in a performance evaluation later in 2011. *See* Docket Entry No. 27 Ex. B-8 at 1–2. Millsap also declined to include Smith on a faculty hiring committee she convened in the spring of 2011. Smith alleges that the College gave him the negative performance evaluation and excluded him from the committee because of his speech at the June 17 meeting. Smith filed this suit on June 23, 2011.

## II.   STANDARD OF REVIEW

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

### III.   THE RETALIATION CLAIM

   *A.  Elements*

A "public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).  On the other hand, the government's interests in regulating the speech of its employees "differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  *Id.* (quoting *Pickering*, 391 U.S. at 568).  The elements a public employee must prove to establish a First Amendment retaliation claim attempt to balance these competing interests.  He must show that: (1) he suffered an adverse employment action; (2) he spoke on a matter of public concern; (3) his interest in commenting on the matter outweighed the College's interest in promoting efficiency; and (4) his speech motivated the College's action against him.  *See Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999) (citations omitted).[4]  The "public concern" and

---

[4] There is some confusion about the number of claims that Smith is asserting.  The College appears to believe that Smith brought two claims: (i) a First Amendment claim based on the denial of his right to speak at the June 17 meeting, and (ii) a First Amendment retaliation claim based on the alleged retaliatory actions taken against him after he spoke at the meeting.  Accordingly, it has briefed both issues in its motion.  However, a close reading of Smith's complaint and briefing reveals that Smith only asserts a single retaliation claim.  *See* Docket Entry No. 12 at 5–10; Docket Entry No. 32

"balancing" elements "are legal in nature and are for the court to resolve." *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (citing *Connick*, 461 U.S. at 147–48 n.7). The final element, "whether plaintiff's protected speech was a substantial or motivating factor in the adverse employment decision," is usually a jury question. *Id*.

The College argues that summary judgment is appropriate because Smith has failed to present evidence that could satisfy the first, third, and fourth elements of the standard. It does not dispute that Smith spoke as a citizen on a matter of public concern—namely, on whether the College should continue its dues deduction policy.

### B. Adverse Employment Action

The College first argues that Smith, who remains employed at the College, did not suffer an adverse employment action. In the Fifth Circuit, only a limited number of events count as adverse employment actions: "discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Pierce v. Tex. Dep't of Crim. Justice*, 37 F.3d 1146, 1149 (5th Cir. 1994). The Fifth Circuit has "declined to expand the list of actionable actions, noting that some things are not actionable even though they have the effect of chilling the exercise of free speech." *Breaux v. City of Garland*,

---

at 13–18, 20–24. The Court thus need only address the College's motion for summary judgment on Smith's retaliation claim.

9

205 F.3d 150, 157 (5th Cir. 2000) (quotation and citation omitted). Many retaliatory actions that can have severe effects on the lives and well-being of employees—including "mere accusations or criticism," "investigations," "psychological testing," "false accusations," and "polygraph examinations that do not have adverse results for the plaintiff"—have been deemed not actionable. *Id.* at 157–58 (citations omitted). Indeed, for educators like Smith, "decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures, while extremely important to the person who has dedicated his or her life to teaching, do not rise to the level of a constitutional deprivation." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (quotation and citation omitted).

To meet his burden, Smith points to three allegedly retaliatory actions taken against him: (i) the formal reprimand; (ii) the negative performance evaluation; and (iii) his exclusion from the new faculty hiring committee. The College argues that the negative performance evaluation and committee exclusion were not adverse employment actions. The Fifth Circuit has not directly addressed whether these last two acts count as adverse employment actions. Other courts have classified negative performance evaluations as adverse actions either as a general matter, *see Guilloty Perez v. Pierluisi*, 339 F.3d 43, 49 (1st Cir. 2003) (assuming, without addressing the issue, that

10

negative performance evaluations standing alone can constitute adverse employment actions), or when other benefits are tied to the evaluations, *see Braswell v. Allen*, 586 F. Supp. 2d 1297, 1307 (M.D. Ala. 2008) ("A poor performance evaluation that directly results in denial of pay raise of any significance constitutes an adverse employment action."). Given the Fifth Circuit's statement that "mere . . . criticism" is not actionable and its generally restrictive approach to the adverse action element, *Breaux*, 205 F.3d at 157, this Court concludes that at a minimum a plaintiff in this Circuit would have to establish a reasonable likelihood that a negative performance evaluation might affect pay, opportunities for promotion, or similar conditions of employment. Because Smith has not identified any such repercussions flowing from the 2011 evaluation, that conduct does not qualify as an adverse action. Likewise, Smith's exclusion from the hiring committee falls in the category of events that the Fifth Circuit treats as nonactionable "administrative matters." *Harrington*, 118 F.3d at 365.

However, the first action taken against Smith, the formal reprimand, was an adverse employment action, and the College does not argue otherwise. A formal reprimand is actionable for a key reason: it, "by its very nature, goes several steps beyond a criticism or accusation and even beyond a mere investigation; it is punitive in a way that mere criticisms, accusations,

11

and investigations are not." *Colson v. Grohman*, 174 F.3d 498, 512 n.7 (5th Cir. 1999) (citing *Scott v. Flowers*, 910 F.2d 201, 208 (5th Cir. 1990)). The reprimand was an official rebuke of Smith's behavior; it served as a prelude to and put him at risk of termination; and it went on his permanent record, where it remains today. The fact that Smith was formally reprimanded is sufficient to show that he suffered an adverse employment action.

    C. Pickering *Balancing Test*

Second, though the College does not dispute that Smith was speaking as a citizen on a matter of public concern, it does argue that Smith's speech fails the *Pickering* balancing test. The *Pickering* test requires the Court "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In doing so, the Court must consider whether Smith's statements impaired "discipline by superiors or harmony among co-workers, ha[d] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[d] the performance of the speaker's duties or interfere[d] with the regular operation of the enterprise." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 192 (5th Cir. 2005) (quoting *Rankin v. McPherson*, 483 U.S. 378,

388 (1987)).  The time, place, and manner of Smith's speech are relevant to this determination, as is the context in which it arose.  *See Victor v. McElveen*, 150 F.3d 451, 457 (5th Cir. 1998) (quoting *Rankin*, 483 U.S. at 388).

The College contends that "courts have long held that Boards may restrict public comments" in a limited public forum such as the June 17 meeting, and it implies that this fact alone carries the day under the *Pickering* test.  Docket Entry 27, at 19.  But, as discussed previously, *see supra* note 4, Smith is not trying to enjoin the Board's policy forbidding public comment at its "discussion sessions"; instead, he is alleging that the punishment he received for speaking two sentences in violation of that policy—a punishment found not in the "discussion session" policy itself but through application of a generally worded section of the faculty ethics code directing that people be treated "with respect, dignity and justice"—was unlawful retaliation.  There is a fundamental distinction in First Amendment law between whether a policy restricting speech is itself valid as a general matter and whether the consequences imposed for a particular violation of that policy amount to unlawful retaliation.  *See Robinson v. York*, 566 F.3d 817, 825 (9th Cir. 2009) ("[T]he *Pickering* balancing test can favor protected speech even where the speech violates the employer's written policy

13

requiring speech to occur through specified channels."); *Brockell v. Norton*, 732 F.2d 664, 667 (8th Cir. 1984) (stating that it could not conclude that a police department's chain-of-command policy "will always take precedence over the interest of a public employee in open communication" but that it instead "must look to the particular circumstances of each case to determine the importance of enforcing the chain of command against an employee whose speech breaches that policy"). A general restriction on speech may be content-neutral, but the punishments resulting from violating such a restriction may stem from content- or viewpoint-based discrimination, a prospect more likely in a case such as this one in which the punishment is not found in the content-neutral rule itself but instead in an independent and highly discretionary standard requiring "respectful" conduct.

The feature of this case the College emphasizes–that Smith violated a speech restriction that is content neutral on its face–does not make this an unusual retaliation case. Employees asserting First Amendment retaliation claims often violated a policy that they are not challenging in its own right. *See, e.g.*, *Robinson*, 566 F.3d at 825; *Brockell*, 732 F.2d at 667 (both involving violations of police chain-of-command rules). In such situations, courts treat the presence of the policy as a factor favoring the government in balancing the *Pickering* factors, but still assess the other factors to determine

whether the punishment applied to an employee for violating the policy in a particular situation amounts to unlawful retaliation. *See Connick*, 461 U.S at 153 & n.14 (noting that the government's position in the balancing test is strengthened, but not made impervious, when the employee violated an official policy); *see also, e.g.*, *James v. Tex. Collin Cnty.*, 535 F.3d 365, 379–80 (5th Cir. 2008) (balancing various *Pickering* factors in deciding retaliation claim arising from discharge of county employee who violated rule against political campaigning during working hours); *Davis v. Allen Parish Serv. Dist.*, 210 F. App'x. 404, 411–13 (5th Cir. 2006) (balancing various *Pickering* factors in deciding retaliation claim in which plaintiff engaged in speech that violated the confidentiality policy of the psychiatric hospital that employed her).

Other than the "no comment" policy itself, the only *Pickering* factor that the College cites to support Smith's reprimand is the disruption it attributes to Smith's conduct. But that disruption was negligible. He uttered just two sentences, and the Board laughed at the exchange and quickly returned to its business. In fact, it was Elam, not Smith, who attempted to continue the debate with Smith after Smith had obeyed the Board's order to cease talking. Moreover, Smith's speaking appeared to be not a premeditated disruption but rather an impulsive reaction to Elam's statement

that the union had agreed to direct deposit of dues, a statement that also provoked a surprised response from Trustee Criss. And although Smith did state that Elam was "not telling the truth," that was only after Elam had first used the incendiary word "lie." Docket Entry No. 37 at 15:22–15:57.

The College does not allege that Smith's speech impaired discipline or relationships at the College, impeded Smith's duties, or interfered with the College's operation. As in *Pickering*, the speech occurred outside of the classroom and thus cannot be shown or presumed "to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Pickering*, 391 U.S. at 572–73. Moreover, Smith's speech took place outside of work hours and in "non-work areas of the office." *Connick*, 461 U.S. at 153 n.13 (noting that such factors would have favored the plaintiff had they been present).

Given that Smith was speaking on a matter of public concern and that the two comments he made during a one-minute exchange did not in any meaningful way undermine the efficient operation of the College, the Court has no difficulty concluding that the *Pickering* balancing test must be resolved in Smith's favor.

16

### *D. Speech as Motivating Factor*

Third and finally, the College argues that summary judgment is appropriate because Smith cannot show that the formal reprimand was motivated by his speech.[5]  Although the College admits that Smith was reprimanded because he spoke, it argues that Smith was reprimanded only because of the allegedly disruptive manner in which he spoke and not because of the content of his speech.  But the following facts are more than enough evidence to allow a reasonable jury to find in favor of Smith on this element: the timeline of what transpired at the meeting, the controversial nature of the issue on which Smith spoke, and the fact that the object of Smith's criticism, Elam, filed the complaint that resulted in the reprimand. *See Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) ("Whether an employee's protected conduct was a substantial or motivating factor in an employer's decision to take action against the employee is a question of fact, ordinarily rendering summary disposition inappropriate.").

## IV.   CONCLUSION

Because Smith did suffer an adverse employment action in the form of the formal reprimand, because the *Pickering* balancing test must be

---

[5] Because the Court has already decided that the formal reprimand was the only adverse employment action taken against Smith, it need not address whether Smith's negative performance evaluation or exclusion from the hiring committee were motivated by his speech.

resolved in his favor, and because whether his speech was a motivating factor in his reprimand is a disputed issue of material fact, summary judgment in favor of the College is inappropriate. Smith has, however, abandoned his claims against Defendant Elam. Accordingly, the Defendants' Motion for Summary Judgment (Docket Entry No. 27) is **GRANTED** as to Elam and **DENIED** as to the College.

**IT IS SO ORDERED**.

**SIGNED** this 3rd day of December, 2012.

_____
Gregg Costa
United States District Judge